IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JONATHAN JONES**
1831 Berkley Ave
Cincinnati, Ohio 45237

**PLAINTIFF**

v.

**OHIO DEPARTMENT OF PUBLIC SAFETY,**

C/O Toby Chamblis
EEO Officer
1970 West Broad St
Columbus, OH 43218

and,

**JOHN MOORE** *in both official and individual capacities,*

C/O Toby Chamblis
EEO Officer
1970 West Broad St
Columbus, OH 43218

and,

**KARA JOSEPH** *in both official and individual capacities,*

C/O Toby Chamblis
EEO Officer
1970 West Broad St
Columbus, OH 43218

**DEFENDANTS**

**2:22 CV 3692**

CASE NO._____

DISTRICT JUDGE

JUDGE WATSON

MAGISTRATE JUDGE

MAGISTRATE JUDGE JOLSON

**COMPLAINT WITH JURY DEMAND**

FILED
RICHARD W. NAGEL
CLERK OF COURT
2022 OCT 13 AM 11: 00
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
EAST. DIV. COLUMBUS

## PART I.
## Nature of the claims

1.        Diversity in the hiring process for law enforcement continues to be a constant issue. Since 2018, studies have suggested that diversity in law enforcement may improve policing where fewer arrests, far fewer stops, and, most of all, use of force is utilized less by minorities than Caucasian officers. As a former Corrections Officer with the Ohio Department of Rehabilitation and Corrections, Mr. Jones has first-hand knowledge of the differences between races and tactics used to gain compliance. A diverse community is more apt to trust law enforcement agencies when they see that some people have sworn to serve and protect reflect themselves. However, it has been determined that 25 percent of Black American candidates are removed from every stage and step of the process. That is from testing to the polygraph to the actual background investigation, oral boards (if applicable), to the Ohio Department of Public Safety's determination, as reported by Columbus Free Press and former Columbus, Ohio Police Officer Anthony Wilson.

2.        Mr. Jones, an applicant for the Cincinnati Police 110th class, has faced hurdles with being selected over the years. He has had higher test scores, more experience in a law enforcement background, and has even ranked higher in the interview process than a coworker at Warren Correctional Institution. Both men had military experience; however, the older, more seasoned Black male was not selected for the 109th recruit class but was called as an alternate when too many people bowed out of the class. Mr. Jones was still not selected even though he passed the rest of his requirements for another Caucasian Male. According to a conversation between the two, he had no experience in any law enforcement background and was a first-time applicant compared to Mr. Jones's sixth time. Black Americans face many hurdles.

3.        Before this Court, Mr. Jones brought attention to an agency called the Law Enforcement Automated Data System (LEADS), which requires a synopsis of any applicant with a criminal record to determine if that person is eligible to use their system. In addition, all applicants trying to become police officers must be certified to operate this system. If the LEADS administration does not approve, the department cannot hire them. Civilians who also apply are subject to the same approval, but they have the option to become practitioners and not operators; therefore, their process is more lenient. Nevertheless, the fact that many minorities have criminal records is a sizable disqualifying factor when seeking jobs in law enforcement.

4.        LEADS is accused of discriminatory actions by denying Mr. Jones access to the database, thus preventing him from a job opportunity using BCI records not in accordance with

the O.R.C. denying Mr. Jones access for an arrest over a disposition that was not disqualifying. LEADS is accused of denying that Mr. Jones's conviction of disorderly conduct was expunged, restoring all rights to Mr. Jones in 2007. LEADS is accused of granting preferential treatment to Caucasian males who were granted access with questionable admissions, with one arrested with a disqualifying conviction with time served under their security policy (OO). Before the Court, it is argued that Due Process is unavailable and a violation of rights. LEADS is accused of purposefully eliminating qualified minorities from consideration.

5.     Mr. Jones would like to inform the Court, according to a filing in Southern District Court in Cincinnati, against the City of Cincinnati, case number 1:22-CV-530. A similar charge is in place for hiring discrimination. These two cases are similar but evident that the departments themselves can be a co-conspirator in discriminating against minorities, purposefully limiting the number of minorities, especially Black men, from the department. Presented to this Court is evidence of a system where LEADS will deny access; the department will deny the potential recruit and make a claim that LEADS controls the database and has the final say so. In return, LEADS will assert that an appeal process is not taken but is at the department's discretion, and the department will inform that person that there is no appeal process. Minorities are left at a considerable disadvantage.

## PART II.
### Jurisdiction and Venue

6.     Pursuant to 28 U.S.C. 1331, this Court has original jurisdiction over Plaintiff's claims made under federal law because those claims constitute a civil action arising under the Constitution, laws, or treaties of the United States.

7.     Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over Plaintiff's blame made under state law because those claims are so related to the claims made under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Pursuant to 28 U.S.C. 1391, this Court is the appropriate venue because the Southern District of Ohio is the judicial district where a substantial part of the events or omissions giving rise to the claims for relief occurred.

9.     Pursuant to Rule 82.1 of the Local Civil Rules of the United States District Court of the Southern District of Ohio, the Eastern Division at Columbus is the appropriate division

because it serves the counties in which a substantial part of the events or omissions giving rise to the claims for relief occurred.

**PART III.**
<u>**Parties**</u>

10.     Plaintiff Jonathan Jones ("Plaintiff Jones" or "Mr. Jones") is a natural person who is a resident of Hamilton County, Ohio. Mr. Jones applied in 2019 to be a City of Cincinnati Police Officer. He was accepted to attend Cincinnati's academy. However, he was denied CJIS database access, which is a requirement in the duties of a police officer. LEADS denied access due to a fourteen (14) year-old arrest in 2005 that resulted in expungement in 2007, restoring all rights to Mr. Jones. This denial prevented Mr. Jones from attending the 110th Recruit Class and gainful employment with the Cincinnati Police. Despite meeting all requirements under City policy under his conditional offer, the City of Cincinnati rescinded its offer and denied Mr. Jones the appeal process.

11.     Defendant Ohio Department of Public Safety is a municipal corporation in Franklin County, Ohio. Its LEADS division provides criminal justice information to law enforcement agencies within the State of Ohio.

12.     Defendant John Moore ("Defendant Moore") is a natural person who is a resident of Franklin County, Ohio. Defendant Moore was, at all relevant times, an employee of the Ohio Department of Public Safety. He was a LEADS Administrator who denied Mr. Jones access due to arrest. Mr. Moore was a contributing decision-maker on whether Mr. Jones would be hired as a Cincinnati Police Officer.

13.     Defendant Kara Joseph ("Defendant Joseph") is a natural person who is a resident of Franklin County, Ohio. Defendant Joseph was, at all relevant times, an employee of the Ohio Department of Public Safety. She was the Program Administrator, and in her role, she conducted background checks on candidates requesting CJIS database access. She was also a contributing decision-maker on whether Mr. Jones would be hired as a Cincinnati Police Officer.

**PART IV**
<u>**Facts of Case**</u>

14.     Mr. Jones, a Black male, then aged 45, applied and was granted a conditional offer for a spot at Cincinnati Police Academy for the position of police recruit for the 110th recruit class on November 2, 2019, with a start date of December 2, 2019. Mr. Jones was a previous alternate a year prior for the 109th recruit class with a start date in January 2019, as he had undergone over a year's worth of background checks. On November 2, 2019, Mr. Jones was

given a form for an application for LEADS access. LEADS access is required to perform the duties of an Ohio police officer by using the Criminal Justice Information System (CJIS) database. This database is housed and controlled by Ohio State Patrol, to which all agencies pay for access and is granted to a *"user"* after application. On November 14, 2019, Mr. Jones was given a letter where his offer was rescinded due to what LEADS claims was a violation of Section (OO), a "Serious misdemeanor" M1 charge that Mr. Jones had on his BCI record. Furthermore, for another arrest, LEADS claims not being disclosed but uncovered for a previous arrest that showed a *"lack of candor"* on behalf of Mr. Jones.

15.     Mr. Jones could not secure the appeal process outlined in the City of Cincinnati Human Resources Handbook for Disqualifying Criteria. Mr. Jones contends that despite the City of Cincinnati's refusal to grant the appeal process that is mentioned within OAC 4501 for denial of LEADS access, the actions of the Department of Public Safety set the tone for discriminatory actions based on Title VII for using BCI records, not in accordance with ORC 109.57(E)(2). This action was discriminatory for relying solely on arrest records not updated by BCI in place of court records and court-ordered disposition. Mr. Jones notified LEADS in his application that he was arrested in 2005 for domestic violence but was offered disorderly conduct, dismissed, and expunged in early 2007. Instead of requesting any information from Mr. Jones, LEADS used a fourteen (14) year-old written police report instead of 2007 court documentation with a non-disqualifying disposition to base their claim of a violation under Section (OO) Serious Misdemeanor.

16.     Discrimination charges were filed with the EEOC against Ohio State Patrol and Cincinnati Police Department agencies for hiring discrimination. Both agencies used the arrest by acceptance of an incomplete BCI record and police report to justify and claim no discrimination for denying Mr. Jones the ability to a vital component required to perform the duties of a police officer. Mr. Jones's then counsel suggested that Mr. Jones pull back his EEOC complaint of discrimination against LEADS case number 532-2020-00549. Because he thought there was no connection between LEADS being considered an employer and issues of the investigator showing reluctance to perform a proper investigation. Mr. Jones disagreed. Upon this reluctance from the EEOC, and at the request of the then lawyer Charles McKinney, Mr. Jones pulled back his complaint on the Department of Public Safety. EEOC sent a notice to the DOJ from the EEOC that the DOJ would handle the issue directly. This notice was submitted by the EEOC's then-Director Melanie Breen on April 30, 2020, for the request for action where *"That Agency will act on your request and issue the Notice directly to you."* That request had gone unanswered until notice was sent to the DOJ from Congressman Steve Chabot's Office

with a request from Mr. Jones on the status of the investigation and the time that had elapsed. The Department of Justice, on August 16, 2022, granted Mr. Jones the right to sue the Department of Public Safety due to 180 days that had elapsed (exhibit A). This is the same process that has been initiated granting Mr. Jones the ability to bring Cincinnati to Federal Court. Furthermore, most likely to be a subject of immediate dismissal due to the timeline.

17.    Before that notice came, Mr. Jones filed with OCRC for discrimination under 4112 when no word or notification came from the Department of Justice on June 3, 2021. The case was dismissed under a No Probable Cause on January 13, 2022, and a request for Reconsideration was granted after filing on January 24, 2022. At the time of the dismissal of charges, Charles McKinney, the lawyer retained, had ceased communications with Mr. Jones on March 8, 2021. As a result, Mr. Jones filed an improper motion in Hamilton County, which was also the wrong Court. Since the letter of right to sue was issued, Mr. Jones's case in Hamilton County was dismissed, and he has now looked to the Southern District for this matter. DPS and the EEOC were also sent notifications via email. Shelli Brock, Associate Assistant Attorney General, and magistrate Beridon also viewed the document.

## PART V
### Employer defined under OAC 4112

18.    Plaintiff believes definitions and wording contained within OAC 4112 clearly state that an indirect control relationship between LEADS and Ohio Police agencies makes it a joint employer relationship between CJIS access and the functions of an Ohio Police Officer. There is no doubt that without access, the job cannot be performed, as this is evident in this case. The wording in OAC 4112 of *"employer"* and *"employee"* are in question. Moreover, it is a strong argument for the Ohio Department of Public Safety's claim that a Title VII claim cannot be brought against them because they are not the intended employer and have no decision-making in the hiring process. Mr. Jones does not believe this, and the evidence does not support the Ohio Department of Public Safety's claims.

19.    Section 4112, (1) **"Person" includes one or more individuals, partnerships**, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons. **"Person" also includes, but is not limited to, any owner, lessor,** assignor, builder, manager, broker, salesperson, appraiser, agent, employee, lending institution, and the state and all political subdivisions, **authorities, agencies,** boards, and commissions of the state.

(2) **"Employer" means the state, any political subdivision of the state, or a person employing four or more persons within the state, and any agent of the state, political subdivision, or person.** (4) **"Labor organization" includes any organization that exists, in whole or in part, for the purpose of** collective bargaining or of dealing with employers concerning grievances, **terms or conditions of employment**, or other mutual aid or protection in relation to employment.

20.    The basis of this argument outlined and highlighted by the boldened words under ORC 4112 is similar to the wording of O.A.C. 4501:2-10-03 Participation in LEADS. This chapter defines a relationship between an applicant's request and a *"user agreement"* to *"participate"* or use a system **owned** by another as a **condition of employment.** That is covered and similar under ORC 4112.

21.    Traditionally, LEADS is not considered a leasing agency or a placement agency; however, LEADS does, in fact, in **whole or in part (4) does play a part in terms or conditions of employment**. If not, the offer from Cincinnati would not have been rescinded upon LEADS denial of Mr. Jones using their equipment after conducting their investigation. As stated in OAC 4112 **(1)** Rule 4501:2-10-10 titled LEADS owned equipment/connected agency owned equipment under (A) informs terminal agencies that maintenance, upgrades and will be monitored randomly (J) by LEADS staff or their representatives is not allowed by any other than the owner of the equipment. Rule 4501:2-10-11 notifies users of sanctions up to a loss of access if there are any violations. Rule 4501:2-10-12 discusses fees for participation in LEADS. By the mere wording of O.A.C. 4501:2, LEADS is the owner of the CJIS database and all equipment which makes them a lessor who allows their services to be used for payment and who have their own rules required to be followed to maintain usage of their services. Therefore, LEADS is clearly defined under Section 4112 (1).

22.    Under Rule 4501:2-10-03, participation in LEADS requires an application. For participation or the right to work as an officer of the law,
**(C)(8)** *Conduct a complete background investigation of all terminal operators, including, but not limited to:*
**(a)** *An applicant national web-check ten print electronic submission to BCI & I and F.B.I.*
**(b)** *The agency is required to notify the C.S.O. of any applicant's criminal record. The existence of a criminal record may result in the denial of access.*
This wording implies a condition of employment or an application for services required by a third party to be employed by another. Mr. Jones does not believe that there is an argument suggesting that without LEADS-owned equipment, which is required and the only agency authorized to grant CJIS database usage, the job of an officer can be performed. Access to the

database is required; without it, there cannot be any employment by another agency that is the intended employer. This still places an indirect-control aspect of LEADS in employment decisions.

23.    Under Section 5.1.1.3, Criminal Justice Agency User Agreements of the LEADS Security Policy. Numbered 1-11, it discusses a Criminal Justice Agency User, meaning a *"person/individual"* employed under a criminal justice administration who is receiving access to CJI., which is maintained only by LEADS, shall enter into a signed written agreement with LEADS. Furthermore, the agreement shall include **(6) Screening (Pre-Employment)**. Pre-employment is defined as *"Occurring or undertaken prior to or in preparation for employment."* O.R.C. 3358:5-3-24, concerning this definition's overall synopsis, discusses pre-employment conditions as a *"check as a final stage of the hiring process."* Therefore, the notion that LEADS does not play any vital role in employment decisions is inaccurate.

24.    Even if the language is not explicitly stated within the O.A.C., the relationship between LEADS and Mr. Jones is highly suggestive of indirect control in the hiring process or even the continuation of an officer's duties since access is required. If this was not the case, then relying upon LEADS access would not be required, and Mr. Jones would have been present for the academy. Nevertheless, this is not the case. The Department of Public Safety, in their response to an Ohio Civil Rights Commission (OCRC) complaint **(exhibit B)**, contended that Mr. Jones could have used a different source such as OHLEG page 5, first paragraph,

*"Furthermore, Charging Party's suggestion that direct access to LEADS is 'required to do the functions of a police officer' is not accurate. LEADS is a resource for law enforcement agencies. Not all law enforcement agencies in Ohio are LEADS agencies. Not all officers have LEADS access. Some may use, instead, the Ohio Law Enforcement Gateway (OHLEG) offered by the Ohio Attorney General's Office…".*

25.    The Ohio Department of Public Safety presents a misleading statement intended to purposefully deceive and sway the investigator's opinion without offering additional context. OHLEG is only limited to the state of Ohio and does not have access to multi-state criminal databases. An officer who pulls over a wanted felon from New Jersey who does not have access to LEADS will only be limited to the state of Ohio's information. Many agencies use a combination of OHLEG and LEADS; however, LEADS is more advanced and provides more information. The Department of Public Safety also states that if a department requires access to LEADS, then access to only OHLEG, if offered, is insufficient. LEADS is the only CJIS Database access supplier handed to every state patrol agency by the F.B.I. There is no other option.

26.     Furthermore, the Department of Labor defines the definitions of employer, employee, and person. The issue Mr. Jones brings to the Court is clarification under 29 U.S. Code 203. Definitions

**(c)** "State" means any State of the United States or the District of Columbia or any Territory or possession of the United States;

**(d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency but does not include any labor organization or anyone acting in the capacity of officer or agent of such labor organization**

27.     Mr. Jones contends that this definition under this U.S. Code also links LEADS to having an employer-type relationship with all Ohio Law enforcement agencies that require LEADS access. In both exhibit(s), the August 11, 2021 (exhibit B) response and March 9, 2020 (exhibit C), the Ohio Department of Public Safety clearly states that,

> *"LEADS was not designed only to provide criminal justice information to law enforcement agencies within the State of Ohio. LEADS was also intended to form a vital component of the National Crime Information Center (NCIC) operated by the Federal Bureau of Investigation (F.B.I.) in Clarksburg, West Virginia. NCIC maintains computer files of information provided by each of the fifty states. LEADS users in Ohio can access NCIC files through LEADS, just as users in other states can access NCIC files through their own states' systems. Thus, LEADS provides criminal justice information from across the county to Ohio Law enforcement agencies and, at the same time, provides criminal justice information from Ohio to law enforcement agencies across the country."*

28.     According to the Department of Public Safety in two separate documents, the Department of Public Safety who is defined as a "person" is acting per the description in a capacity that is directly or indirectly in the interest of an employer. This would be an Ohio police agency, including Cincinnati, the intended employer for the prospected employee, Mr. Jones. The Department of Labor also discusses a Steering Committee.

030.660 Steering Committee

29.     A "Steering Committee," composed of representatives from 6 locals (in the same geographical area) engaged in the same industry, is affiliated with a District Council of a particular International. The six locals comprising the "Steering Committee" have contracts with the same employer. The District Council also contains numerous other locals in other related

industrial activities. Factually, it has been ascertained that the Steering Committee is subordinate to the International Union; is composed of local labor organizations engaged in an industry affecting commerce; is endowed with a separate organic identity in that it is a continuing body conducting regular meetings and electing its own officers and having bylaws; exists for the purpose of coordinating its local members' activities, contract proposals, contract negotiations; and has among its officers a Financial Secretary who is required under its bylaws to be bonded (thus indicating the presence or expectation of funds). Consequently, the Steering Committee has been determined to be an intermediate type labor organization within the meaning of the Act even though the Constitution and Bylaws of the District Council make no provision for such a "committee."

30.    040.101 LMRDA, Section 3(a) Definition of COMMERCE means trade, traffic, **commerce**, transportation, **transmission**, or **communication among the several States or between any State and any place outside thereof.**

31.    Commerce is also a service, by definition. Under the definition of the word, the meaning stated is LEADS, a service defined in the translation of Commerce, that is shared with multiple agencies, which is communication among the several States or between any State and any place outside thereof. The Department of Public Safety's definition of what services LEADS provides is covered under this definition. Boldened are functions of LEADS.

32.    Under Rule 4501:2-10-02, LEADS steering committee is defined under INTERMEDIATE BODIES under the DOL. This means it is logical to use the definitions of jurisdiction set forth by the Department of Labor.

030.601 LMRDA, SECTION 3(i)

33.    "LABOR ORGANIZATION" means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.

<u>030.611 PURPOSE NEED NOT BE TO DEAL DIRECTLY</u>

34.     The phrase "exists for the purpose . . . of dealing with employers" in section 3(i)
does not require that the purpose of the organization be to deal with employers directly. Instead,
it is sufficient that the organization exists for the purpose of dealing with employers indirectly
through the organization's member organizations. Thus, an organization whose function is to
coordinate the activities of its member bodies in dealing with employers "exists for the purpose. .
. of dealing with employers" within the meaning of section 3(i).

35.     The claim that there is no employer relationship between LEADS, CPD, and Mr.
Jones by the Department of Public Safety is believed by definition and action to be an invalid
argument. Mr. Jones applies for access to the database and completes the *"user agreement"* form
to gain access. He is denied access to the system for arrest(s) that do not exist, where he is found
not guilty of these arresting charges in a court of law. This would suggest that LEADS played a
significant role in denying access, which is the *"cause"* of being denied the job.

36.     According to Middlebrooks v. Teva Pharmaceuticals U.S.A., Inc No. 17-00412
(E.D.Pa. February 1, 2018), a federal district court has held that a foreign parent company can be
held jointly liable for emolument claims against its U.S. subsidiary. The Department of Labors'
final rule on "Joint Employer" outlined by Constnage, Brooks, Smith & Prophete, L.L.P. says;

1.  Indirect control is exercised by the potential joint employer through mandatory directions
    to another employer that directly controls the employee. But the direct employer's
    voluntary decision to grant the potential joint employer's request, recommendation, or
    suggestion does not constitute indirect control that can demonstrate joint employer status.
    Acts that incidentally impact the employee also do not indicate joint employer status.

2.  Other important provisionsFinally, in Section 791.2(d), the proposed regulations were
    significantly revised to make the following changes:

    1.  Public agencies can now be potential joint employers.

    2.  Contractual agreements that require the potential joint employer to maintain
        quality control standards to ensure the consistent quality of the work product,
        brand or business reputation, or monitoring compliance with these types of
        agreements "does not make joint employer status more or less likely under the
        Act." The Final Rule says, "Such contractual agreements include, but are not
        limited to, specifying the size or scope of the work project, requiring the employer
        to meet quantity and quality standards and deadlines, requiring morality clauses,
        or requiring the use of standardized products, services, or advertising to maintain
        brand standards."

37. According to the City of Cincinnati's response to the EEOC complaint (exhibit D), located on page 3, last paragraph;

> *"Jones's conditional offer of employment was withdrawn for the simple and non-discriminatory reason that he was denied access to the LEADS database by the Ohio State Highway Patrol. The City does not control this process or have any authority over LEADS access. Without access to LEADS Jones would be unable to perform the essential functions of his job as a police recruit."*
> Again this contradicts the claim of the Department of Public Safety which was falsely stated to deceive that the *"Charging Party's suggestion that direct access to LEADS is required to do the functions of a police officer is not accurate."*

38. Plaintiff asserts that there is a relationship, outlined in OAC 4112, that is sufficient to prove Plaintiff's claims on an employment relationship. By the statement of the City of Cincinnati, indirect control is exercised by the potential joint employer (LEADS) through mandatory directions (the O.A.C.) to another employer (CPD) that directly controls the employee (Mr. Jones and any other person requesting access or who has access). The fact that Mr. Jones had to sign a user agreement with stipulations implied for granting or continued access is indicative of a contractual agreement in which LEADS, by a statement, is required to maintain the integrity of the database. Mr. Jones believes it appropriate to apply Title VII to the Ohio Department of Public Safety. Therefore, the argument that there is no employer relationship is believed not valid.

## PART VI
### Arrest and Conviction Records in Employment

39. The issue now is whether the Department of Public Safety can successfully claim that they are at liberty to be suspicious of a candidate if there is a history of arrests if those arrests are not linked to convictions in the matter of Mr. Jones. An email (exhibit E) presented by an unnamed Cincinnati Police representative to Cincinnati's Civil Service Commission on November 21, 2019, was used as evidence to justify the denial of Mr. Jones's appeal. Kara Joseph of LEADS and TAC Sheila Bond discussed multiple arrests as justification for denying access. This is evident by the reference made in the written statement from the Department of Public Safety that claimed Mr. Jones's polygraph conducted by CPD did not contain an earlier arrest. There were no records of a previous arrest uncovered by Kara Joseph that was inquired about. This is stated in both documents on page 5, in respective places. Mr. Jones was considered to have multiple arrests for a domestic violence charge.

40.     It is unknown if Ms. Joseph did inquire about the arrest, but according to Mr. Jones's Personal History Questionnaire (PHQ) taken on May 9, 2019, at 9:18 am on page 33 of 58 (exhibit F). Mr. Jones does state the arrest and the circumstances of that arrest. According to the admission, Mr. Jones was bitten by the mother of his child, who filed a false report against Mr. Jones when he made it clear he was contacting police over the incident. Since both parties filed charges against one another on the same night, both parties were given capiases. Mr. Jones claimed he was not charged, and his case was dismissed. Mr. Jones's claim that he was a victim in this dispute is valid due to case number 04/CRB/17263, State of Ohio vs. Shellay Mills (exhibit G). Ms. Mills was charged with disorderly conduct after biting Mr. Jones and hyperextending his finger in an attempt to steal personal belongings. 04CRB/17263 has one day's difference between the arrest on this case and Mr. Jones's BCI record at that time. Hamilton County Case number 03/CRB/15985 was the initial case dismissed in court error. Mr. Jones had to refile with the Court's permission.

41.     According to Hamilton County Court Records, Ms. Mills had also been charged and found guilty of menacing against Mr. Jones. According to court records, Mr. Jones is the apparent victim. Moreover, somehow, not having his dismissal expunged off his record gave the Department of Public Safety the impression that he was guilty of committing a domestic violence crime solely based on the arrest charge. In no way did the Department of Public Safety investigate or inquire about this issue. Mr. Jones also claims that the 2003 arrest could not be "uncovered" if disclosed.

42.     Further issues arise from this, showing a contradiction in a statement by the Department of Public Safety and Ms. Joseph. According to the email between TAC Bond and Ms. Joseph about the 2003 incident (exhibit E), Kara Joseph of LEADS, third paragraph, first sentence, states,

> *"We do review every single police report and supporting documentation on anyone who has been arrested."*

According to the Cincinnati Police Public Records Request (exhibit H), CPD destroyed the 2003 record under the City's RC-3 retention cycle after five (5) years from the arrest date due to no further incidents within that five (5) year limit. **Therefore, the record was not available**. The Department of Public Safety did not look any further in its investigation past Mr. Jones's BCI report, which still had the arrest with a dismissal (exhibit I) listed. Therefore, it is not feasible or

legitimate to assert that a reasonable attempt was made to find any supporting documentation on the 2003 arrest. The reason for the dismissal and the totality of circumstances were unknown.

43.     Another concern is the response made by the Department of Public Safety that is recorded in both documents, where Cincinnati Police are chastised for not discussing the 2003 arrest during the polygraph test. According to the written statement, LEADS is *"a department of public safety, division of state highway patrol, a program for administering and operating a law enforcement automated data system, to be known as LEADS, providing computerized data and communications to the various criminal justice agencies of the state."* However, LEADS has interjected itself into the employment process of Cincinnati Police and has taken a deep concern with Mr. Jones. Mr. Jones, who has been in the process a total of 7 times, has successfully passed his lie detector test every time he has taken it. After the PHQ is written and submitted, another PHQ is given at the time of the polygraph. This procedure is done to help jog the memory and to change some information if needed if there is any doubt that a polygraph failure is possible. The same information was recorded. Before the polygraph, there is a brief question and answer before the test begins. Mr. Jones did disclose this arrest in both PHQs, and this situation was discussed prior to the polygraph. Due to the nature of the incident and the fact that Mr. Jones was not found guilty, it was not discussed at the time of the polygraph test. The question asked of Mr. Jones was, 'has he ever been arrested for a crime.' The legitimate answer would not include the 2003 arrest because Mr. Jones was not charged with a crime. It is highly questionable why LEADS and the Department of Public Safety interjected themselves into the hiring process and how the polygraph of Mr. Jones was administered. This process is not suggestive of neutrality.

44.     Examining the 2005 arrest, LEADS took a stance that Mr. Jones was guilty of M1 Domestic Violence without legal justification. Mr. Jones did report he was arrested for Domestic Violence but was regarded as being untruthful since Mr. Jones's response to a 14-year-old arrest did not match up with the Golf Manor Police has written on their arrest report. According to the police report that Mr. Jones did not know of, until disclosure at the denial of his hearing, claimed that there was blood on the lip of Ms. Cradle, Mr. Jones's then-girlfriend, in 2005. According to DPS, second paragraph, page 5 of the 2021 OCRC response,

*"The polygraph asked Charging Party to "explain in detail any physical confrontations in which you were involved with a spouse, parent, or other family member, boyfriend, girlfriend, or other family member [sic.J." Charging Party described a 2005 incident, corresponding to the 2005 portion of a police report, which documented injury to the victim/other participant in the altercation, his girlfriend at the time. The report went further, though, reciting her claim that Charging Party "jumped on her back and took her to the ground with a headlock," and "further*

*stated that (Charging Party] began to choke her when he got her to the ground" then stating she "had a small amount of blood on her shirt. It appears to come from her bottom lip."*

45.     Mr. Jones did not recall this incident, and that is because this incident with blood never occurred. The viewpoint of Ms. Cradle differed from that of Mr. Jones's recollection of events on the jump on the back. The police report does not state that Mr. Jones tried to leave the immediate area and attempted to call Golf Manor's nonemergency police number. This was prevented on two occasions; Ms. Cradle disconnected his phone call to his mother and snatched his cell phone in a failed attempt to call 911. According to Mr. Jones's recollection of events, after the failed call to 911, Mr. Jones did become angry and got in the face of Ms. Cradle. Then, Ms. Cradle pushed Mr. Jones, and Mr. Jones reacted by placing Ms. Cradle in a headlock. The recollection of events of Mr. Jones jumping on the back of Ms. Cradle should not have been taken a face value. Mr. Jones, who stands at 5 feet 10 inches, is shorter than Ms. Cradle, who stands at 6 feet 1 inch. According to Mr. Jones's recount of events, GMPD informed Mr. Jones that it was the first time that both parties' statements mirrored one another. However, since there were scratches on the back of Ms. Cradles' neck, he was arrested for domestic violence. Unlike the 2003 incident where Mr. Jones had the injury, and Ms. Mills was still able to file a complaint, GMPD denied Mr. Jones the ability to file a complaint against Ms. Cradle.

46.     The significance of this is that Mr. Jones disclosed this on his lie detector test and on both PHQ forms in 2019 for the 110th Recruit Class. He also placed the same information on both forms for the 109th and the 108th Recruit Class and passed his polygraph every year. Since Mr. Jones passed his lie detector test and showed no signs of deception, it is not logical to assert that Mr. Jones "lacked candor," as described by DPS. According to written statements, Mr. Jones informs that his record was expunged. Both parties did show to Court. After Ms. Cradle informed the prosecution of the actual events, the preceding judge did not want to dismiss the case. The prosecution knew that Mr. Jones had just entered the Navy and was interested in joining a police department; a plea of not guilty would cause a trial, and the Navy would most likely be notified. Mr. Jones was offered a plea deal of disorderly conduct with the promise of expungement. This plea would satisfy the burden of the judge, who wanted to continue and allow Mr. Jones to remain in the Navy without incident and apply for CPD or any other police agency. On February 1, 2007, Mr. Jones did not pay any fees for expungement and had court papers mailed to him with a title of expungement under ORC 2953.52 (exhibit J).

47.     The attitude of DPS toward these facts is very dismissive towards Mr. Jones. Such statements presented to OCRC are reflective of the treatment of Mr. Jones.

*"..had Charging Party revealed all the arrests in his background, or had different records been provided to Respondent – then perhaps the result would be different. "- page 6, second paragraph DPS, 2021*

*"His decision included, among other things, a second arrest which he failed to disclose - which made both the arrests and lack of candor relevant to the determination."-page 6, first paragraph DPS, 2021*

*"Charging Party omitted pertinent information from his employment application and background check.-page 6, third paragraph DPS, 2021*

48. Not only did Mr. Jones provide this information claimed by DPS and Ms. Joseph as nonexistent, but Mr. Jones also provided this information on his application for LEADS access. Mr. Jones recalled the questions asked on the LEADS application for service as if there were any convictions resulting from an arrest of domestic violence. Mr. Jones answered truthfully, as he has done over the years. Mr. Jones's statement (exhibit K) is the exact wording that Mr. Jones placed on his LEADS application for service. This document was used to support CPD denying the appeal and presented to the EEOC and Cincinnati Civil Service Commission hearing as proof of a disqualifying offense. In the request for information on the OCRC case against DPS, no information, such as Mr. Jones's application, was submitted or received by Mr. Jones. Mr. Jones informs DPS that his record is expunged. Instead of requesting that information, they used a BCI record containing no judicial portion and no disposition noted, with case number 05CRB21729; if entered, it would show "NO RECORD ON FILE" in the Hamilton County Clerk of Courts search. DPS also used a highly inaccurate and poorly written police report as justification over court disposition, giving Mr. Jones a conviction of an M1 Serious Misdemeanor charge. Since 2007, Hamilton County did not send records to GMPD or BCI for record deletion. Concerning the missing application, it is highly suggestive that deception and a covering of facts are evident.

49. According to CJIS LEADS Security Policy 5.12.1 (3)(a)

*If a felony conviction of any kind exists, the Interface Agency shall deny access to CJI. However the Interface Agency may ask for a review by the CSO in extenuating circumstances where the severity of the offense and the time that has passed would support a possible variance.*

50. As discussed in the email between Ms. Bond and Ms. Joseph, extenuating circumstances were discussed.

*"If you look at LEADS Administrative Rule 4501:2-10-01 Definitions, Section OO, it will list a number of issues that tend to be denials. I say tend to, because we do understand that charges can be filed against someone wherein the offense does not meet the charge. For example, we had an individual who was in his 40s and had been charged with a felony trespass when he was attending Ohio State. When he was 19, the Shoe was undergoing reconstruction. One side was out and had an orange snow fence between the sidewalk and the field...OSU ended up charging him, and he was convicted of a felony trespass. We granted his access."*

51. In the case of the young man at Ohio State, extenuating circumstances were granted. LEADS did not agree with the decision of the Court. The individual's race is unknown, but if speculation is valid, based on the current racial makeup of Ohio State University and the

fact that Mr. Jones did attend Ohio State University between 94'-97', the enrollment of minorities then was not high. Statistics rate Ohio State University at 63.5 White, 7.18 Asian, 6.44 Black, and 4.93 Hispanic, the number of minorities is pretty low, and the chances are high that the above-mentioned is a White male. Only LEADS would know if this person being referenced is, White or of another race. When considering who can be granted extenuating circumstances, it can be reasonable for Mr. Jones to speculate about the disparity in treatment. After all, Mr. Jones wrote in a statement and passed his polygraph test with a description of a possible 4th-degree felony under 2909.04 committed by his ex-girlfriend to prevent calling 911 services. That ordinance was enacted a year before Mr. Jones's arrest. Mr. Jones was not given the benefit of having extenuating circumstances applied and was treated as a lessor.

52.     Mr. Jones, who appears to be a victim and unjustly accused of being an abuser, is treated as the individual who was denied access to a database from a false report and officers of GMPD who refused Mr. Jones the ability to press charges, unlike that of Ms. Mills. Mr. Jones was compared to an individual who sent her significant other to the hospital with stab and gunshot wounds, never convicted due to the victim refusing to testify. Plaintiff disagrees that the gravity of the offenses described is so severe that consideration was not made.

53.     DPS's statement of,

> *"Taken together, and as explained below, when the LEADS administration staff identifies a prospective or current user with a serious misdemeanor, such as domestic violence with accompanying threats of or actual harm to the victim, or when - in addition - the applicant did not appear forthcoming about the nature or extent of the situation or another similar incident, then, regardless of whether the applicant pled to a lesser offense, thereby avoiding a conviction for domestic violence or a sex offender designation, LEADS can reasonably deny access to LEADS information." -page 4, DPS 2021*

It is highly suggestive and supportive that the arrest was viewed and not the disposition or relevant facts of the case. DPS's viewpoint on using BCI records was not following ORC 109.57(E)(2), which only authorizes BCI to provide information about criminal convictions and guilty pleas. Mr. Jones's 2005 disposition and conviction of disorderly conduct were expunged, and in the 2003 arrest, there was no guilt or conviction.

54.     Therefore, DPS's claim for justification for denying the "required service" to the database can be lawfully made since the record can still be viewed is troublesome.

> *"First, BCI is an arm of the Ohio Attorney General's Office. Respondent cannot speak to what BCI "should" have done or what information it had available to it. Second, Respondent has not received an order sealing Charging Party s criminal record pursuant to Ohio Revised Code 2953.52-53. (While Charging Party claims that his criminal record relating to at least one of his past criminal incidents has been "expunged," the statute he cites relates to sealing the record and retaining an index of the record so that, in the proper circumstance, the record can still be reviewed,) Third, Respondent received and reviewed information directly from CPD's TAC, not just a criminal history." - last paragraph page 5, DPS 2021*

Issues resulting from Mr. Jones being denied access due to the lack of extenuating circumstances on the relevant facts of the issue of the arrest, which DPS summarized is also concerning,

> *"Respondent cannot speculate as to the records in Charging Party's possession, or his personal beliefs, for example, on how the claims were resolved, sealed, or eligible to be sealed."* -page 6, first paragraph, DPS, 2021.

## ORC 2901.01(A)(9)/18 U.S.C 922(g)(9)

55.    Mr. Jones finds fault, as the reasoning to deny Mr. Jones was not sufficient due to the explanation of the fact that included information that the record used to deny was not relevant. The mere fact that LEADS and DPS have ignored all of what has been stated prior. Nevertheless, an offense of violence under ORC 2901.01(A)(9) M1 Domestic Violence is ineligible for sealing, or expungement was not even considered, which is suggestive of the incomplete BCI record. However, the Respondent (DPS) cannot speculate as the records are in Charging Party's possession, as stated in DPS's official response.

56.    According to a request from Mr. Jones, the Village of Golf Manor, GMPD ran a LEADS search on Mr. Jones to see his record and availability to gain access on May 16, 2022 (**exhibit L**). According to the search, an active CCW permit showed on file. The significance of this is that Mr. Jones has held a CCW permit since 2010, the same year he purchased his first firearm.

57.    Under Ohio Law, a domestic violence conviction carries a weapons disability. Additionally, 18 U.S.C 922(g)(9) prohibits a person convicted of a misdemeanor crime of domestic violence from shipping, transporting, possessing, or purchasing any firearm or ammunition for life. This carries a *"firearm disability."* It is very apparent that Mr. Jones does not have a weapons disability and, therefore, cannot be subjected to a domestic violence conviction under state and federal law that would prohibit Mr. Jones from legally owning a firearm. Since Mr. Jones has held an active CCW since 2010, and it is visible in LEADS 12 years later, Mr. Jones, within reason, believes that LEADS could apply the law to him accordingly. This was not the case.

## Green Factors

58.    According to Section 5.12 LEADS Security Policy and discussed in the email, the time of elapse since the incident is supposed to be considered as well as the gravity of the situation. Mr. Jones finds fault under the Green Factors. Already described and verified as truthful due to the polygraph results of Mr. Jones, the nature of the offense was not so severe that Mr. Jones was found guilty of domestic violence. He attempted to flee and take other steps not

described in the initial police report. The time that passed from the arrest to the application for LEADS access was 14 years, four months, and 16 days. From the expungement time, the time elapsed was 12 years, nine months, and one day without any further incidents. Therefore, Mr. Jones's recidivism chances are not probable, especially under the circumstances in which he was arrested in both altercations.

59.     According to LEADS, since they are not the intended employer, the nature of the job sought does not have any genuine concern or basis for judgment. According to Cincinnati's hiring policy, Mr. Jones is eligible for hire since his misdemeanor charge was over three years minimum to avoid possible dismissal. Furthermore, under OAC Chapter 109:2-1-03 C, he is eligible to attend an Ohio Peace Officer Academy, which was done in 2010 and 2013 for the Private Security Firearms Training Program that is required to carry for job purposes (exhibit M) legally. However, Mr. Jones was denied computer access, which is problematic since he is eligible for a police academy. Therefore, LEADS did override Cincinnati's Police recruiting process and negated their investigation and process that had looked into this situation and had correctly applied the law in his first dismissal by reinstating Mr. Jones back into the process after error.

60.     The nature of the function sought was, using a computer database, which per the statement of LEADS, is their sole function to maintain the integrity of the database. According to records, Mr. Jones has no convictions of a serious misdemeanor that would bar him from gainful employment and has not abused any database. Mr. Jones worked for the Ohio Department of Rehabilitation and Corrections (ODRC) for five years. Under the direction of the State of Ohio, he operated within the State ran database for job functionality without incident and it is questioned on the job necessity to deny Mr. Jones computer access when he operated within a database. According to the response to OCRC when this issue was brought up, DPS responded,

*"In the first place, this Charge is misplaced because Respondent was not Charging Party's employer/potential employer under Revised Code Chapter 4112, therefore we are unable to provide a copy of the application for employment used for employment. The Charge itself makes clear that Charging Party sought a position with the Cincinnati Police Department (CPD)" -page 4, last paragraph DPS, 2021.*

*"The Ohio State Highway Patrol is a division of the Department, and also an instrumentality of the State. LEADS, under the Highway Patrol, simply is not part of the City of Cincinnati or otherwise involved in the employment decisions of any of the many municipalities, political subdivisions, and law enforcement agencies that seek access to LEADS information, and therefore cannot provide policies*

*relating to the screening, hiring, firing, qualifications and disqualifications of applicants for CPD, as well as a record of applicants who applied for the same position with CPD as Charging Party within the last two years." -page 4, last paragraph DPS, 2021*

61.     Presented to the Court is a situation that needs clarification. In the same response to OCRC, after all of the facts were disclosed, and after all of the disparaging remarks made at the expense of Mr. Jones for having a lack of candor, being untruthful, showing deception, LEADS appears to attempt to walk back the actions done by making this statement. Furthermore, it is an admission that Mr. Jones's entire claim is valid.

*"If circumstances have changed, or if, as it appears, Charging Party is primarily concerned about what may happen should he apply for a law enforcement position again, and his prospective employer makes a LEADS access inquiry when those records are no longer on his criminal history, then that concern exceeds the scope of the charge." Last sentence page 5, DPS, 2021.*

62.     Under the Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 44 U.S.C. 2000e et seq. Mr. Jones finds fault with DPS since nothing has changed. Mr. Jones was afforded the proper application of the laws in his purchasing of firearms, and job opportunities, including working for the State of Ohio, military career, and police academy eligibility. However, it was only when he applied for police and was given a conditional offer that his rights ran out. For DPS to claim that the BCI record of Mr. Jones should be clean bears no relevance as the record prior was not enough to deny and was clean since there were no convictions. Mr. Jones presented the BCI record to OCRC (exhibit N) as evidence that there was nothing there years prior in order for BCI to correct the issue on their end in such a short amount of time. Since there were none, as there was no code listed on his record showing a conviction, LEADS actions and statements are considered discriminatory use of arrest records.

### PART VII
#### Similarly Situated

63.     Plaintiff believes that he has been able to successfully present a valid argument on the question of the employer relationship outlined in 4112. Additionally, he has successfully presented a valid argument on expungement and the fact that LEADS and DPS used the arrest and other material purposefully, ignoring all other issues that Mr. Jones presented in a statement. Moreover, they completely disregarded applying applicable laws toward Mr. Jones. Therefore, Prima Facie is needed to be presented. Prima Facie initially posed a problem for the Plaintiff; however, according to a similar case filed, Ohio case number 2:22-cv-00027 filed this year has

2019 discriminatory implications that apply to Mr. Jones. Mr. Iverson and Mr. Kendall brought the case against Columbus Police Department for not receiving conditional offers, while seven (7) Caucasian men and women were given conditional offers with questionable backgrounds. These issues show an absolute disparity in the Department of Public Safety's handling of granting access. According to the lawsuit filed on 01/05/22 in the Southern District Court against the City of Columbus. The complaint filed deals with individuals who admitted to the following: *(a) paying prostitutes for sex; (b) touching his father's girlfriend's vagina while she was asleep and without consent; (c) statutory rape; (d) masturbating in a company vehicle at work; (e) engaging in sexual intercourse in the workplace; (f) using illegal drugs of marijuana, cocaine, heroin and MDMA and illegally abusing prescription painkillers; (g) driving under the influence; (h) engaging in bestiality by having their dogs lick their genitals to cause orgasms; (j) being accused of rape by a prior girlfriend; (k) having illegally used another's prescription Adderall; (l) having been sentenced to prison for theft; (m) having stolen money from an employer; (n) having stolen money from an employer's customers; and (o) having several jobs in the last few years including with one employer who fired him and "deemed him untrainable."*

64.     While only some of the offenses pertain to the Department of Public Safety's LEADS Security Policy, there were recruits listed in this complaint by Columbus Background and Recruiting showing deceit and failing polygraph. Self-admission to theft, drugs, accused of rape, restraining orders of prior wives being filed against them. These are violations within section (OO) without conviction. There was time served for theft where LEADS granted access to this Caucasian individual to attend the 134 Columbus Recruit Class. These individuals, currently working officers for the City of Columbus, show a disparity in thought and treatment by the Department of Public Safety as these admitted offenses are described in Section (OO).

- **Joesph Vencill**, a Caucasian male, showed multiple instances of theft on page 13 of the complaint filed in Southern District Court. In 2009, he switched price tags on an item in the military post exchange, saving $30-$40 on the item. While employed at Wendy's 2005-07, he reported that he would short-change customers and keep the money. He attempted to convince the polygraphist that he had a prescription for a drug he used but ultimately admitted that the prescription had long since expired. These issues are applicable and show a disparate impact that OCRC says does not exist. Under LEADS Administrative Rules 4501:2-10-01 Definitions, Joseph Vencill self-admitted to theft (4) Any offense involving theft, identity theft, fraud, or other similar offense.
    - Joseph Vencill self-admitted to touching father's girlfriend's vagina while she was sleeping. This could be argued that such a violation of the body falls under (2) any offense which involves a crime against a person in which physical harm or the

threat of physical harm occurred. The defense of Public Safety giving access on the basis that Joseph Vencill was not arrested is moot when there is a self admission. In the response of Department of Public Safety, Mr. Jones was characterized as having a *"lack of candor"* in his recollection of events, by the Department of Public Safety in their response, even though Mr. Jones passed his lie detector and had no concerns about lying to a polygraphist. More questions arise in the manner in which Mr. Jones was scrutinized was not in the same manner in which Mr. Vencill was investigated. **Joseph Vencill was granted access.**

- **Brandon Sipes**, a Caucasian male, on page 14 of the complaint, showed self-admission to stealing money from his position with 711 Parking in 2013 in valet parking. He stated that customers would pay him their parking fees, and he would mix it into his tips. This would fall under (4) any offense involving theft.
    - When asked by his polygraphist if he has ever engaged in a sex act with someone unable to give consent, *the applicant stated that he was in attendance at a party in 2009, and there 'was a girl there who was extremely drunk and throwing up on herself.' He stated that she was put into the shower, and he climbed into the shower with her as well, stating that they were both naked as they 'both didn't have a change of clothes.' He would go on to say that 'there was no penetration, no oral, nothing like that.' He stated, 'But we were both naked, so like, my penis was touching her, and I had my arms around her and stuff.'* It should be argued that circumstances like this fall under (2) any offense that involves a crime against a person in which physical harm or the threat of physical harm occurred. Again it is to be pointed out that LEADS took exception towards Mr. Jones and found an error with his background investigation, including a polygraph for an arrest not convicted of; however, it found no areas of concern for Mr. Sipes. **Brandon Sipes was granted access.**

- **Adam Robinson**, a Caucasian male, areas of concern relevant to this case and under section (OO) were restraining orders filed against him by his ex-spouse, illegal use and distribution of Vicodin as a drug dealer, illegal use of Percocet, OxyContin, illegal use of cocaine, illegal use of mushrooms, illegal use of LSD, illegal use of heroin, and deceptive answers. These problems were described in a summary of his polygraph examination as follows:
    - *In the PHS, the applicant listed his first wife on two occasions filed a restraining/protective order against the applicant.*
    - *The applicant admitted to using, buying, and selling Vicodin.*

- ○ *The applicant admitted to buying and using Percocet not prescribed to the applicant.*
- ○ *The applicant admitted to buying and using OxyContin not prescribed to him.*
- ○ *The applicant admitted to buying and using cocaine.*
- ○ *The applicant admitted to buying and using mushrooms.*
- ○ *The applicant admitted to buying and using LSD.*
- ○ *The applicant admitted to trying heroin in 2003.*
- ○ *After the exam, the applicant's reactions to the area of sex offenses and serious crimes were indicative of deception.*

Under Section (OO) (2) any offense which involves a crime against a person in which physical harm or the threat of physical harm occurred is applicable due to the restraining orders filed on two (2) occasions. While the drug usage and selling are not under (OO), the Department of Public Safety maintains that Mr. Jones lacked candor and found fault with his lie detector without acknowledging a claim from CPD that the polygraph indicated deception. Depending on information not obtained through this Columbus discrimination case, Mr. Robinson may have also admitted to *"Serious misdemeanor"* M1 codes that fall under ORC 2925 Drugs and ORC 3719 Controlled Substances. **Adam Robinson was granted access**.

- **Nathan Hanna**, a Caucasian male, his *"areas of concern"* relevant to (OO);
  - ○ *Just being before dismissed, the applicant comments that there had been a time when was a sophomore and had sex with a girl. The applicant said 'afterwards' the girl used words to the effect that the applicant had raped her. The applicant denied raping the girl, said the sex was consensual, and that the girl had initiated the sex. Asked why the girl would make such an accusation, the applicant stated he did not know, and the occasion was the only time the applicant's 'name was associated with the word rape.'*

According to the polygraph examination, scrutiny of the applicant's chart tracings revealed that his responses to the sex offenses questions indicated deception when discussing public indecency-related issues and exposure. However, the Department of Public Safety found issues with Mr. Jones in which no evidence was presented that showed deception within his polygraph and recollection of events. **Nathan Hanna was granted access**.

- **Dakota Freeman**, a Caucasian male, his area of concern related to (OO) stealing from Walmart, for which he was found guilty of theft and served jail time.
  - ○ *The applicant stated that he was caught stealing a television from Walmart in 2013. He stated that he 'got caught up with the wrong people and that he 'was trying to impress friends.' He stated that the television was valued at $250. He*

> *had to pay a fine, was put on one year of probation, and was sentenced to 98 days*
> *in jail, of which he had to serve two days.*

According to LEADS under (OO) (4) Any offense involving theft, identity theft, fraud, or other similar offense, did not apply to the convicted Caucasian male. **Dakota Freeman was granted access (exhibit O).**

65.    Notable differences are presented here. What is presented is evidence of intent to deceive coming from multiple Caucasian applicants during a polygraph. However, those who intentionally deceived were caught and were still given access to the database. LEADS did not investigate these applicants who gave disqualifying admissions. According to the final statement from DPS on Mr. Jones,

> *"Charging Party, or perhaps even the Commission, may not agree with LEADS, the Highway*
> *Patrol, Ohio Department of Public Safety, FBI, or Department of Justice about the strictness of the*
> *standards used to decide who will have access to vital and confidential criminal justice information. Such*
> *disagreement, though, does not show discrimination; and, that is especially so where, as here, decisions*
> *are based on a reasonable and particularized review of each applicant that is applied regardless of race,*
> *color or gender." - page 6, 3rd paragraph, DPS.*

Mr. Jones contends that the "strictness of standards" described was not applied to 5 Caucasian males the same year that Mr. Jones was denied access for an expunged low-level, non-disqualifying offense of disorderly conduct over 12 years prior to application.

66.    DPS would have the Court believe that Mr. Moore did not know the race of Mr. Jones,

> *"...what is more is that it does not appear that LEADS Administrator Moore was even aware of Charging*
> *Party's race or color when Moore made the decision not to extend access."-page 6, middle first paragraph,*
> *DPS.*

Mr. Jones disagrees. Checking the box is the first thing that is asked of each applicant for access. The race of Mr. Jones was placed on the application. In the BCI report, there is the race of Mr. Jones. It is not possible for Mr. Moore or any person doing work where records are viewed; if visible, the person's race would not be known. Plaintiff believes that prima facie has been established. Mr. Jones was qualified under Ohio law, under Cincinnati Policy. He was denied access to an entry-level position but granted five Caucasian men with arrest charges, deception, and questionable background information. LEADS treatment of Mr. Jones does not equate to the treatment of those mentioned

**PART VIII**

Disparate Impact/Treatment

67.     Under OAC 4501:2-10-01(OO) are violations of a "Serious Misdemeanor" M1 charge that lists any offense classified by the Ohio Revised Code as a misdemeanor of the first degree. This section of the Administrative Code is what is called into question. In the six criteria given, it has been established that Mr. Jones does not have an offense or admission of a severe M1 misdemeanor. Therefore placing Mr. Jones under this code is highly suspicious. The misinterpretation of (OO) (2), Which involves a crime against a person in which physical harm or the threat of physical harm occurred, is designated to ONLY misdemeanors of the first degree. How DPS loosely applies this rule demonstrates the claim of either disparate impact, which is unintentional or disparate treatment, which is intentional. It will be up for the Court to decide, but Mr. Jones believes this was intentional rather than unintentional.


68.     These misdemeanors of a first degree are covered under ORC Chapter(s) 2919 and 2903. LEADS Security Policy, 5.12 at pp. 67-68, referenced by the Department of Public Safety, states that "Serious misdemeanors" are disqualifying for computer access, not disorderly conduct. In the instance of Columbus Police Officer Dakota Freeman, who was arrested for theft in 2015. According to the Ohio code, his arrest is classified as an M1 Serious Misdemeanor; under Section (OO)(4), Any offense involving theft, identity theft, fraud, or other similar offenses. According to the admissions of Officer Freeman, he was also jailed for two days out of 98 days. However, he was granted access, with a conviction that, according to LEADS policy, is disqualifying.


69.     In this instance, LEADS Security Policy conflicts with OAC (Chapter 109:2-1-03)(6);

Except as otherwise provided in paragraphs (C)(1), (C)(2), or (C)(3) of this rule, the person, within three years of applying to attend the basic course, has been convicted of or pleaded guilty to an offense under Chapter 2913. of the Revised Code or a municipal ordinance similar to an offense under Chapter 2913 of the Revised Code.

The ORC Code for theft is Chapter 2913. Under the proper application in which LEADS would assert that they had legitimate reasoning to grant access is that Mr. Freeman, at that time, had surpassed the 3-year requirement and was legally eligible to attend a police academy. In cases where a person is eligible to attend a police academy, it does not justify denying that person the ability to have access that is a requirement for the functions of that job. The time of elapse from Officer Freeman's 2013 arrest to the 2019 time of application for LEADS access was six years.

LEADS Security Policy should not supersede any other code as its function is to maintain the integrity of the database. It is argued that LEADS is and has been operating outside of its intended purpose here in Ohio.

70.     Severe errors in interpreting (OO) have led to a difference in treatment in granting access. According to State v. Barbero, 297 Or.App 372 (2019), admission is a statement made for some purpose other than to acknowledge guilt. The fundamental principle is that the admission does not accept personal responsibility for committing a crime. It is simply an acknowledgment of a statement or fact. These statements are not sufficient on their own to satisfy all of the elements of the offense. Nevertheless, an acknowledgment of an issue not binding for conviction is still an offense admitted to, in which LEADS chose to grant access to Caucasian males. It is rightfully questioned if LEADS maintained the integrity of the database and showed racial bias in a nonbiased system by granting their access. In this instance, these severe issues have led to disparate treatment when 5 Caucasian males, with admissions that do conflict with LEADS Security Policy (OO), are not considered due to no convictions or arrests. At the same time, one person granted access of the five was convicted of a disqualifying offense and granted access. Compared to Mr. Jones, this shows inconsistencies in the process as Mr. Jones was denied access with no conviction and improper arrest under the circumstances.

71.     Mr. Jones is similarly situated to the applicants chosen for access over him, treating Mr. Jones differently, where he was subjected to more or different criminal background checks or given different standards for evaluating criminal history. Statistically, 5 Caucasian males were granted access in the same year, and one Black male was denied access, that is known. Statistically, a brief examination of the racial breakdowns listed by the cities according to media outlets, minorities are not well represented in the job of a police officer. It is unknown if LEADS has denied other minorities, such as Mr. Jones, under the guise of the law.

- In Cincinnati, according to news outlets, using 2020 numbers, 1057 sworn Cincinnati officers, and 29% are a minority which is 307 Black/others compared to 750. Census stats, White alone 50.3%, Black alone 41.4%, and Hispanic alone 4.2%
- According to 2020 numbers, Cleveland had 1,613 sworn officers; 362 are Black, and the remaining 1251. Cleveland has a 23% Black participation. Census stats, White alone, 39.7% Black alone, 47.6%, and Hispanic, 11.9%
- The Ohio State Highway Patrol had 1,540 uniformed law enforcement officers; there are currently 358 minority officers, 23% compared to 76% White.

- In a field where the jobs are predominantly White such as Columbus Police Department, using 2019 statistics, 1,862 officers, and of that, 9.8% were Black, meaning Columbus had 182 Black officers compared to 1,680 White officers. Census stats, White alone 57.4%, Black alone 29.2%, and Hispanic alone 6.3%.

72.    Mr. Jones believes that the issues presented to the Court thus far, if practiced more than once as this complaint discusses, LEADS has effectively limited the hiring process of minorities across the State of Ohio. A records request of this breakdown submitted to OSHP Central Records asking for a comparison of a racial breakdown of denials was not able to be answered (**exhibit P**). Information requested from LEADS also needs more answers.

73.    It is known from this case that Mr. Jones was denied the ability to be granted an appeal by Cincinnati Police. Mr. Jones also called Cleveland Police Department and Columbus Police Department to inquire about appeals from a LEADS denial. According to Cleveland and Columbus PD, neither agency will grant an appeal process alongside Cincinnati.
As stated, the City of Cincinnati contends that LEADS makes the final say in employment decisions by granting access. Recorded conversations with Columbus Background and Recruiting Officer P. Brady confirm what the City of Cincinnati claims in an email sent from Cincinnati's Sentinel Police Association and disclosed by a city council member. The appeal process has been removed and replaced with a "vouching system" as described in the federal case against the City of Cincinnati. Under this vouching system, the Police Chief has to vouch for the person in question, and if not an officer of whom the Chief can state the professional demeanor, that person is not able to have a request for an appeal. While the City of Cincinnati and other departments that do not grant an appeal process deny due process, LEADS is the common factor in that decision to deny.

## PART IX
### Denial of Due Process

74.    Per the LEADS policy, once a person is denied access, according to Section 5.12 of the LEADS Security Policy, the denial may only be appealed by a criminal justice agency administrator. Mr. Jones contends that this places the requester at a disadvantage by being denied due process since the appeal cannot be made direct. Under the liberty interest of due process, Mr. Jones believes that he can make this claim based on any positive governmental statute or governmental practice that gave rise to a legitimate expectation in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).

According to the Court, there are aspects of Due Process (Fundamental Fairness).

1.  The government must provide notice of the charge against.
2.  The government must be able to show that there is an articulated (non-vague) standard of conduct that is being accused of violating.
3.  The government must provide an opportunity to rebut their charges against in a meaningful way and at a meaningful time (the hearing requirement).
4.  In order to sustain its position (I.e., its deprivation of your liberty or property), the government must establish at a minimum that there is substantial and credible evidence supporting its charges.
5.  The government must provide some explanation to the individual based on any adverse findings.

75.     LEADS only provided notice of a charge and nothing furthermore. LEADS policy only allows the Criminal Justice Administrator to initiate the appeal process. By doing this, LEADS can unlawfully deny access, as seen with Mr. Jones. Then claim that the City of Cincinnati is at fault because the City will not follow the policy on initiating the appeal, even if such is stated in writing. This places whoever LEADS wants to be at a disadvantage, and in this case, 5 Caucasian males were not, but Mr. Jones was.

76.     The Due Process Clause serves two primary goals. One is to produce, through the use of fair procedures, more accurate results: to prevent the wrongful deprivation of interests. The other goal is to make people feel that the government has treated them fairly by listening to their side of the story. The process was due since Mr. Jones's rights were involved. Giving the excuse that it was up to the "other" to initiate the appeal process that MAY NOT be granted, as written in the last sentence of Mr. Jones's LEADS denial letter (exhibit Q). According to LEADS, *"Submitting an appeal does not guarantee it will be granted by Ohio's CJIS Systems Officer."*

77.     If LEADS has in writing in the OAC what constitutes an appeal not being granted, the decision to deny could be biased and lead to disparities in how and when an appeal is to be denied. Followed by the fact that the denial was for computer access, where Mr. Jones has operated within a database and had statewide access required to perform his duties at ODRC. Shows that a proper appeal process could have saved time and energy while restoring the rights of Mr. Jones when there is a need for correction. Another alarming issue is that Mr. Jones was dismissed from the process for the first time in his seventh attempt for having an arrest record by Cincinnati on June 26, 2019 (exhibit R). Moreover, on August 15, 2019, he was reinstated into the process once he appealed and produced Court documentation on his expungement (exhibit S).

Mr. Jones believes that Mathews v. Eldridge 424 U.S. 319; 96 S.Ct. 893; 47 L.Ed.2d 18 is applicable in this case. The interest that would be affected by official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedural safeguards, if any. Finally, the Governments interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

78.     Reliance upon the "other party" to request the appeal, as in the case of Mr. Jones, the City of Cincinnati has it written in policy after outlining Chapter 4501:2-10 and sighting (OO), "An appeal process is available anytime there is a denial of access to work on/within RCIC/LEADS." This provision is located on page 2 of the Selection /Disqualification Criteria For Police Recruit under Appendix P **(exhibit T)**, which is part of the City's Collaborative Agreement Refresh. With the Collaborative Agreement, the City of Cincinnati was still under the Constant Decree, where the City was supposed to meet a requirement to hire 34% of qualified Black recruits. At this point, even with a federal decree and an additional agreement for equal representation and treatment, the City of Cincinnati declined, blaming LEADS for the decision. This rationale made the City believe that a conditional offer, a Constant Decree, and a Collaborative Agreement, all legally binding, could be rightfully violated. LEADS policy requires the City to initiate an appeal that may be granted but blames the City for not initiating the appeal. Therefore, Mr. Jones has nothing in place that guarantees Due Process. To further highlight the stance of the coconspirator and the fact that minorities are held at a high disadvantage. During November 21, 2019, Civil Service Commission hearing, CSC denied Mr. Jones's reinstatement due to LEADS Security Policy and the fact that CPD did not initiate the appeal under 15.03 **(exhibit U)**. Of the three listed for CPD denial, Mr. Jones was the only minority, the only one who had finished every requirement meeting his conditional offer to be placed in the 110th recruit class. Moreover, Mr. Jones was the only one who denied any appeal process.

## PART X
### Similarly Situated Unemployed v. Employed

79.     In previous attempts before obtaining information about the 5 Caucasian males granted access to LEADS, Mr. Jones argued that the application of Ohio Law is to all those seeking employment in becoming police officers and those already employed. OCRC, DPS, and civil rights lawyers Mr. Jones spoke with the belief that Mr. Jones is not similarly situated to officers who were arrested for domestic violence charges, who took plea deals for a lesser charge

and retained LEADS access. Mr. Jones challenges this belief that officers are afforded the right to have the application of the law differ from those seeking employment.

80.    As in case number 22-CV-530, Jones v. City of Cincinnati, it is argued that Cincinnati Police Officers, arrested for domestic violence and found guilty of disorderly conduct, retained LEADS access. This was due to the disposition, which should be treated like an applicant arrested for domestic violence and takes a plea of disorderly conduct. If officers are not treated as having the arresting charge, that will disqualify them from job duties and access to LEADS. Then it is not justifiable to apply the arrest charge to Mr. Jones and disqualify him from LEADS access.

81.    Mr. Jones does not have a weapons disability under 18 U.S.C 922(g)(9), which prohibits a person convicted of a misdemeanor crime of domestic violence from shipping, transporting, possessing, or purchasing any firearm or ammunition for life. This carries a *"firearm disability."* Therefore, neither the applicant nor the employed would be able to perform the duties of an Ohio Police Officer with a weapons disability, thus preventing the hiring or retention under the law. In this instance, it is claimed that this is a similarly situated situation as the law takes precedence over the classification of job duties. Mr. Jones used three examples as a comparison to illustrate his point.

- CPD Officer David Dozier was arrested on September 28, 2015, for domestic violence (exhibit V), allegedly punching his fifteen-year-old son in the stomach and knocking out a tooth, leaving a print visible on the child's face to the report. Officer Dozier was held on a bond amount of $2500 under case number 15/CRB/25743, still visible in the Hamilton County Clerk of Court docket search. Officer Dozier was convicted by plea of a disorderly conduct charge, which is not disqualifying. Officer Dozier retained LEADS access after the incident and is currently working as a CPD officer. Officer Dozier did not violate LEADS policy or any Ohio code that would prevent him from retaining access; thus, he retained his job.

- The arrest of CPD Officer J.S. (name not disclosed due to not guilty ruling), arrested on November 2, 2019, for domestic violence under case number 19/CRB/27274 (exhibit W). The jury trial resulted in an acquittal on February 5, 2020. The application for expungement was presented on February 7, 2020. The arrest is no longer visible in the Hamilton County Clerk of Court docket search. Rightfully so, Sgt. J.S. did not violate LEADS policy and retained his access and job.

- CPD Officer Rose Valentino was arrested on March 26, 2020, for domestic violence, assault, and criminal damage resulting from a fistfight with her sister, where both women had swollen eyes. In Butler County Area Court 1, CRB2000279 (exhibit, X) is still visible. On March 23, 2020, all charges were merged, and Officer Valentino was able to plea to a charge of disorderly conduct. Her disposition was amended from domestic violence M1 2919.25; 2 yrs good behavior; AM prog ordered. Officer Valentino was eligible to keep her LEADS access and retained her job.

- CPD Officer Wendell Davidson was arrested on July 12, 2020, for domestic violence (exhibit Y). On August 31, 2020, Officer Davidson was convicted by the Court of domestic violence M1 2919.25. 18 U.S.C 922(g)(9), the firearm disability is applicable in this case, and denial of LEADS access is applicable because there was a CONVICTION of a DISQUALIFYING offense under LEADS Security Policy, where Officer Davidson signed an agreement to follow the rules outlined under LEADS Security Police 5.12. His conviction would also mean that he would not be eligible for a police academy, and his record will not be able to be sealed or expunged under Ohio Law.

82. When reviewing the situation, DPS used Sgt. J.S. who had his access to LEADS access suspended/revoked until a final disposition was submitted at the end of his trial (exhibit Z). LEADS did not have a disposition for Mr. Jones and did not request one. The rationale from DPS in reference,

*"Respondent cannot speculate as to the records in Charging Party's possession, or his personal beliefs, for example, on how the claims were resolved, sealed, or eligible to be sealed. Looking at the two people he does identify, though, he is not similarly situated to them...Furthermore, Charging Party was not a current user, but Scott and Valentino were...As for Rose Valentino, she too was a current officer and not similarly situated to Charging Party. As one would expect, Respondent reviewed the officer's case on the specific facts, including the plea to a misdemeanor. On her circumstances, she was granted access to LEADS."- page 6, first paragraph, DPS, 2021.*

83. The gravity of circumstances when comparing Mr. Jones to Officer Valentino and Dozier is questionable and believed to be irrational. Mr. Jones is not afforded the right to have the law apply to him because he is not a police officer in this instance. DPS will contend that Officer Dozier is Black, and the response to this is that Mr. Jones is suing about unfair hiring practices surrounding minorities. This complaint is specific. As stated by DPS, Officer Dozier has an exemption because he already had access granted.

84.     Mr. Jones finds fault with the statement that his beliefs or actual claims of how his record was sealed and the eligibility of such raise a severe concern. Facts do not matter in the process for those seeking employment or access to the CJIS database. The gravity of the situations described does not have a business necessity to deny an applicant based on a disorderly conduct charge when officers are still able to have access with disorderly conduct charges. The law makes Mr. Jones similar situated to the officers mentioned. Since all of the arrest charges are the same, so should treatment. The law does not single out people due to employment status; such a practice can lead to unequal treatment.

85.     Applying the law after the fact is where there is a difference that Mr. Jones would not be similarly situated to currently hired officers. This is where the "vouching system" has merit. Since Mr. Jones was not uniformed in any capacity as a cadet or an officer, the vouching system is not applicable after the law states whether or not he is eligible for the duties required. Since Mr. Jones was non-uniformed, according to the requirements for admission into a police academy, Mr. Jones had a 3-year requirement that he met.

86.     Argued before the Western Division, Mr. Jones presents the same plea to this Court. If it is feasible, the Court may need to expand its focus on similarly situated in this matter. This foreseeable issue would allow continued hiring issues to arise with using arrest records without conviction. Or the denial of the complete appeal process. According to EEOC, the nature and gravity of the offense or conduct, the time that has passed since the arrest, can be negated simply by keeping a narrow view of similarly situated. Again, the nature of the job is defined under the law for retention and continued employment. If the nature of the job allows the employed database access under Ohio Law, then it indeed allows database access under Ohio Law. With that said, Title VII is in jeopardy if the Court rules that there are no instances of discrimination as none of these issues were considered. Based on the Seventh Circuit's definition of similarly situated:

The requirement is met *"so long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively unless.'"* In Lewis v. City of Union City, the U.S. Court of Appeals acknowledged that *"all material respects"* must be viewed on a case-by-case basis, the Court sought to provide guideposts for courts-and, by extension employers-about what might constitute *"a similarly situated comparator."* Such a comparator:
- "Will have engaged in the same basic conduct (or misconduct) as the plaintiff;
- "Will have been subject to the same employment policy, guideline, or rule as the plaintiff;

- Will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff";
- "Will share the plaintiffs employment or disciplinary history"; and
- May not have the same title or precisely the same job functions.

87.     Suppose the Court is persistent on keeping a narrow focus on similarly situated when it comes down to applying the law. In that case, it justifies actions that can cause a disparity in the hiring process. Mr. Jones respectfully asks for the Court's consideration in this matter.

## PART XI
## Conclusion

88.     It is not believed that the actions described showing any attempt at good faith by LEADS and the statements made by DPS. Mr. Jones was denied the required access for an offense he was not guilty of. As described, no safeguard exists for an appeal process that addresses false allegations or incomplete background checks. LEADS in no way considered the statements made by Mr. Jones informing them that his record was expunged for disorderly conduct. LEADS will allow continued access to current users for dispositions of disorderly conduct regardless of the totality of circumstances that lead to an arrest charge of domestic violence. The business necessity to deny based on Mr. Jones's arrest and disposition fails. In a field under-represented by Black Americans, statistically, this burdens minority applicants for LEADS access and acceptance into any Ohio Police Department.

89.     Circumstantial evidence, also known as indirect evidence, is presumption.

*"Circumstantial evidence can include suspicious timing, inappropriate remarks, and comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic...." Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir. 1994); accord Troupe v. May Dep't Stores Co., 20 F. 3d 734, 736 (7th Cir. 1994).*

A single type of evidence does not prove many cases of intentional discrimination. Instead, many different kinds of evidence- direct detailed, statistical, and anecdotal- are relevant to showing intent and should be assessed on a cumulative basis. Herewith are violations under the EEOC Guidance on Consideration of Arrest and Convictions Records in Employment Decisions that show factual issues that coincide with statistical numbers affecting the minority class.

90.     Mr. Jones contends that he is ineligible for hire by any police department. Recently he applied for CVG Police in Kentucky. It was asked if there were any pending civil lawsuits on the application. Mr. Jones had to respond in the affirmative. Mr. Jones was dismissed from the process when other applicants were more qualified for the job. For the first time in application to be a police recruit, Mr. Jones was dismissed prior to the polygraph test. It is not an ill-conceived thought that a potential employer would not want to hire someone who is in the process of suing another police department or government agency over the denial of CJIS database access. Mr. Jones's desire to represent his community in an under-represented field to help bridge the gap will not be, and Mr. Jones has to face that reality. The plaintiff believes this case has merit, and the Ohio Department of Public Safety has engaged in discriminatory actions.

91.     It is believed that this case is not frivolous and does have merit. It is believed that the Ohio Department of Public Safety (LEADS) needs an apparent response to these allegations, evidenced by the previous filings of blanket statements that led to dismissals filed previously with the EEOC and OCRC.

92.     He is requesting punitive damages for $350,000 under Title VII. Mr. Jones will never wear the uniform of a CPD Officer and is considered too old, with age above 35, which is the age limit cap for all entry-level police candidates outside of major Ohio metropolitan cities. Mr. Jones is seeking economic damages in the most, valued at twenty-five (25) years of a CPD officer's salary that ranges from $65,867.12 to $80,355.96 at the greater annually at $2,008,899. Non-economic damages in half the amount of economic damages at 1,004,449.50 with applicable taxes paid by DPS since Mr. Jones spent most of his life focused on being trained for police work. Mr. Jones is a handcuff baton instructor and took employment positions related to the field of police work. Mr. Jones never considered that he would be ineligible for police duty and, at present, is still determining what career path he is eligible for due to his lack of education and experience in quality jobs.

### PART XII.
### Claims For Relief
### Count I
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e, et seq.
### Race Discrimination - Failure to Hire

93.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

94.     Plaintiff Jones, was at all relevant times an "employee" within the meaning of 42 U.S.C 2000e(f).

95.     Defendant the Ohio Department of Public Safety (LEADS), was at all relevant times an "employer" within the meaning of 42 U.S.C 2000e(b).

96.     As a proximate result of the Ohio Department of Public Safety's (LEADS) actions, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

97.     Consistent with 42 U.S.C. 1981a, Plaintiff Jones is entitled to punitive damages because Defendant Ohio Public Safety (LEADS) engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to Plaintiff Jones' federally protected rights.

### Count II.
#### Violation of the Civil Rights Act of the Civil Rights Act of 1871, 42 U.S.C. 1983
#### Equal Protection Clause of the Fourteenth Amendment to the United States Constitution
#### (Race Discrimination - Failure to Hire)

#### By Plaintiff Jones Against
#### Defendants Joseph, and Moore

98.     All preceding paragraphs are incorporated by reference as if fully restated in his paragraph.

99.     Plaintiff Jones was at all relevant times a "citizen of the United States or other person within the jurisdiction terror" within the meaning of 42 U.S.C 1983.

100.     Defendants Joseph, and Moore were, at all relevant times, "person(s)" within the meaning of 42 U.S.C 1983 because they are sued for prospective inductive relief in their official capacities and for money damages in their individual capacities.

101.     Defendants Joseph, and Moore acted under color of a statue, ordnance, regulation, custom, or usage of the State of Ohio and deprived Plaintiff Jones of his rights, privileges, or immunities secured by the federal Constitution or federal law when they refused to grant access required to be hired by Cincinnati because of race. Alternatively, Plaintiff Jones' race was a motivating factor in their decision to refuse to hire him.

102.     As a proximate result of Defendants Joseph and Moore, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

103.    Plaintiff Jones is entitled to punitive damages because Defendants Joseph and Moore were motivated by intent or acted with reckless or callous indifference to Plaintiff Jones' federally protected rights.

## Count III.
### Violation of Ohio Revised Code Sections 4112.02 and/or 4112.99
### (Race Discrimination - Failure to Hire)

### By Plaintiff Jones Against Ohio Department of Public Safety

104.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

105.    Plaintiff Jones was at all relevant times an "employee" within the meaning of Ohio Revised Code Section 4112.01(A)(3).

106.    Defendant Ohio Department of Public Safety (LEADS) was at all relevant times an "employer" within the meaning of Ohio Revised Code Section 4112.01(A)(2).

107.    Defendants, Ohio Department of Public Safety (LEADS) violated Ohio Revised Code Sections 4112.02 and/or 4112.99 when it refused to grant access to CJIS required for continued employment. Alternatively, Plaintiff Jones race was a motivating factor in the decision by Defendant Cincinnati to not hire him.

108.    As a proximate result of Defendant Ohio Department of Public Safety (LEADS) actions, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

## Count IV.
### Violation of Ohio Revised Code Sections 4112.02(J) and/or 4112.99
### (Aiding and Abetting Unlawful Discrimination)

### By Plaintiff Jones Against
### Defendants Joseph, and Moore

109.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

110.    Plaintiff Jones was at all relevant times an "employee" within the meaning of Ohio Revised Code Section 4112.01(A)(3).

111.    Defendants Joseph, and Moore were at all relevant times an "person(s)" within the meaning of Ohio Revised Code Section 4112.01(A)(1).

112.    Defendant Jospeh and Moore violated Ohio Revised Code Sections 4112.02(J) and/or 4112.99 when they aided, abetted, incited, compelled, or coerced the unlawful discrimination against Plaintiff Jones, set forth in this Complaint.

113.    As a proximate result of Defendants Joseph, and Moore's actions, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

## PART XIII
### Prayer For Relief

114.    Wherefore, Plaintiff request judgement in his favor on all claims in the Complaint and request the following relief:

A.   Economic compensatory damages in an amount to be determined at trial;
B.   Non-economic compensatory damages in an amount to be determined at trial;
C.   Liquidated, treble, punitive, or other exemplary damages in an amount to be determined at trial;
D.   All costs and expenses incurred in pursuing the claims against Defendants;
E.   Pre and post judgment interest; and
F.   All other legal and equitable relief this Court and/or jury determine is appropriate.

## PART XIV
### Jury Demand

115.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff's demand a trial by jury on all claims and issues that are triable.

Respectfully submitted,

By: _____

Pro Se
1831 Berkley Ave,
Cincinnati, OH 45237
Telephone: 513.349.0625
j.appleseed.34@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that on _____, 20____, I mailed my
Motion of Title VII Hiring Discrimination to the Clerk of Courts for filing. Upon
the Clerk's Officer docketing of this [leading, notice of this filing will be sent
through the Court's electronic filing system to all parties represented by attorneys
who are registered users of the Court's electronic filing system as provided for in
Fed.R.Civ.P.5(b)(2)(E).

A copy of this pleading will be mailed, by ordinary United States Mail, postage
pre-paid, to the following unrepresented party/parties this same day:

Department of Public Safety C/O Toby
Chambliss EEO Officer
1970 West Broad St.,
Columbus, OH 43223

John Moore C/O Toby Chambliss
EEO Officer
1970 West Broad St.,
Columbus, OH 43223

Kara Joseph C/O C/O Toby Chambliss
EEO Officer
1970 West Broad St.,
Columbus, OH 43223