**Ohio** | **Department of Public Safety**

Mike DeWine, Governor

Jon Husted, Lt. Governor       Thomas J. Stickrath, Director

**EXHIBIT C**

## Position Statement

### Jonathan Jones v. ODPS- Law Enforcement Administrative Data System (LEADS)

### Charge No. 532-2020-00549

### SUMMARY OF POSITION

On or about January 16, 2020, Jonathan Jones (hereinafter "Charging Party") signed a complaint with the Equal Employment Opportunity Commission against the Ohio Department of Public Safety, as the repository for and staffing agency of Ohio's Law Enforcement Automated Data System (LEADS) ("Respondent") alleging he has been discriminated against due to race. Respondent has not violated Title VII (it was not Charging Party's employer or prospective employer), nor Respondent's policies regarding discrimination and retaliation (Exhibit A).

### RESPONDENT'S REPLY TO CHARGING PARTY'S ALLEGATIONS

Though the Commission lacks jurisdiction under Title VII over Respondent for this Charge, Respondent's actions were reasonable, based on the specific facts at hand, and nondiscriminatory, which is shown below by Respondent's responses to each of Charging Party's allegations. Before turning to those points, however, the Commission may benefit from a fuller understanding of LEADS. Ohio Revised Code § 5503.10 establishes the distribution system for confidential, law enforcement information at issue in this Charge:

> 5503.10 Law enforcement automated data system.
>
> There is hereby created in the department of public safety, division of state highway patrol, a program for administering and operating a law enforcement automated data system, to be known as LEADS, providing computerized data and communications to the various criminal justice agencies of the state. The program shall be administered by the superintendent of the state highway patrol, who may employ such persons as are necessary to carry out the purposes of this section. The superintendent shall adopt rules under Chapter 119. of the Revised Code establishing fees and guidelines for the operation of and participation in the LEADS program. These rules shall include criteria for granting and restricting access to information maintained in LEADS.

Among rules adopted for the implementation of LEADS is Chapter 4501:2-10 of the Ohio Administrative Code.

1970 West Broad Street
O. Box 182081
olumbus, Ohio 43218-2081     (614) 466-3383
www.publicsafety.ohio.gov

Section 4501:2-10-06(C) says: "Messages and/or throughput of any kind accessed through LEADS shall be restricted to the use of duly authorized law enforcement and/or criminal justice agencies for the administration of criminal justice. Access to and dissemination of LEADS throughput is governed by the LEADS security policy (11/1/2016), LEADS manual (10/1/2016) and NCIC operating manual (8/11/2015) available at http://leads.ohio.gov/Manuals." Notably, this list includes manuals and regulations promulgated by the United States government, specifically the Department of Justice:

> LEADS was not designed only to provide criminal justice information to law enforcement agencies within the State of Ohio. LEADS was also intended to form a vital component of the National Crime Information Center (NCIC) operated by the Federal Bureau of Investigation (FBI) in Clarksburg, West Virginia. NCIC maintains computer files of information provided by each of the fifty states. LEADS users in Ohio can access NCIC files through LEADS, just as users in other states can access NCIC files through their own states' systems. Thus, LEADS provides criminal justice information from across the country to Ohio law enforcement agencies and, at the same time, provides criminal justice information from Ohio to law enforcement agencies across the country.

*LEADS Manual*, "General Information" at p. 4. Because LEADS includes access to both state and federal information, then, both state and federal security policies and operation manuals govern access to information. *See also*, 28 C.F.R. §§ 20.1 *et seq*.

One source of restriction to both the state and federal confidential law enforcement information is the LEADS Security Policy on Personnel Security, which provides in part:

> **5.12 Policy Area 12: Personnel Security**
> Having proper security measures against the insider threat is a critical component for the LEADS Security Policy. This section's security terms and requirements apply to all personnel who have access to unencrypted CJI including those individuals with only physical or logical access to devices that store, process or transmit unencrypted CJI.
>
> **5.12.1 Personnel Screening Requirements for Individuals Requiring Unescorted Access to Unencrypted CJI**
> 1. To verify identification, state of residency and national fingerprint-based record checks shall be conducted prior to granting access to CJI for all personnel who have unescorted access to unencrypted CJI or unescorted access to physically secure locations or controlled areas (during times of CJI processing). However, if the person resides in a different state than that of the assigned agency, the agency shall conduct state (of the agency) and national fingerprint-based record checks and execute a NLETS CHRI IQ/FQ/AQ query using purpose code C, E, or J depending on the circumstances. When appropriate, the screening shall be consistent with:
>    a. 5 CFR 731.106; and/or
>    b. Office of Personnel Management policy, regulations, and guidance; and/or
>    c. agency policy, regulations, and guidance.
>    Federal entities bypassing state repositories in compliance with federal law may not be required to conduct a state fingerprint-based record check.

See Appendix K for applicable guidance regarding noncriminal justice agencies performing adjudication of civil fingerprint submissions.

2. All requests for access shall be made as specified by the CSO. The CSO, or their designee, is authorized to approve access to CJI. All CSO designees shall be from an authorized criminal justice agency.
3. ***If a record of any kind exists, access to CJI shall not be granted until the CSO or his/her designee reviews the matter to determine if access is appropriate.***
   a. If a felony conviction of any kind exists, the Interface Agency shall deny access to CJI. However, the Interface Agency may ask for a review by the CSO in extenuating circumstances where the severity of the offense and the time that has passed would support a possible variance.
   b. ***Applicants with a record of misdemeanor offense(s) may be granted access if the CSO, or his or her designee, determines the nature or severity of the misdemeanor offense(s) do not warrant disqualification. The Interface Agency may request the CSO review a denial of access determination.*** This same procedure applies if the person is found to be a fugitive or has an arrest history without conviction.
   c. If a record of any kind is found on a contractor, the CGA shall be formally notified and system access shall be delayed pending review of the criminal history record information. The CGA shall in turn notify the contractor's security officer.
4. ***If the person*** appears to be a fugitive or ***has an arrest history without conviction, the CSO or his/her designee shall review the matter to determine if access to CJI is appropriate.***
5. If the person already has access to CJI and is subsequently arrested and or convicted, continued access to CJI shall be determined by the CSO. This does not implicitly grant hiring/firing authority with the CSA, only the authority to grant access to CJI. For offenses other than felonies, the CSO has the latitude to delegate continued access determinations to his or her designee.
6. ***If the CSO or his/her designee determines that access to CJI by the person would not be in the public interest, access shall be denied and the person's appointing authority shall be notified in writing of the access denial.***
7. The granting agency shall maintain a list of personnel who have been authorized unescorted access to unencrypted CJI and shall, upon request, provide a current copy of the access list to the CSO.
8. ***The agency may appeal the decision of the CSO***, or his/her designee, by submitting a letter from the agency administrator outlining the following items:
   a. The applicant's name, date of birth and OLN.
   b. An explanation as to why an appeal should be granted.
   c. The statement "This agency has internal policies governing the use of LEADS and CJIS system access and the employee will be held accountable to these policies and all LEADS administrative rules. I, as the agency administrator, accept ultimate responsibility for this employee's actions in the use of LEADS".

It is recommended individual background re-investigations be conducted every five years unless Rap Back is implemented.

*LEADS Security Policy*, § 5.12 at pp. 66-67 (emphasis added). Further, Ohio Administrative Code § 4501:2-10-01(OO) specifies that:

> "Serious misdemeanors," for the purpose of being a terminal operator, include but are not limited to the following:
>
> (1) Any offense classified by the Ohio Revised Code as a misdemeanor of the first degree;
>
> (2) Any offense which involves a crime against a person in which physical harm or the threat of physical harm occurred;
>
> (3) Any offense involving the use/misuse of a computer or computer system;
>
> (4) Any offense involving theft, identity theft, fraud, or other similar offense;
>
> (5) Any offense involving the impersonation of a law enforcement officer;
>
> (6) Any offense where the use of LEADS information was instrumental in the commission of the offense.

Taken together, and as explained below, when the LEADS administration staff identifies a prospective or current user with a serious misdemeanor, such as domestic violence with accompanying threats of or actual harm to the victim, or when the applicant did not appear forthcoming about the nature or extent of the situation, and regardless of whether the applicant pled to a lesser offense thereby avoiding a conviction for domestic violence or a sex offender designation, LEADS can reasonably deny access to LEADS information.

> **I.** **I am African American. On November 14, 2019, I received an email from LEADS that they were not going to give me access to the system based on my arrest record. This caused Cincinnati Police Department to rescind their offer of employment, LEADS gave access to a Caucasian who was convicted of a crime.**

In the first place, this Charge is misplaced because Respondent was not Charging Party's employer under Title VII. The Charge itself makes clear that Charging Party sought a position with the Cincinnati Police Department (CPD). The Ohio Department of Public Safety is an instrumentality of the State of Ohio. The Ohio State Highway Patrol is a division of the Department, and also an instrumentality of the State. LEADS, under the Highway Patrol, simply is not part of the City of Cincinnati or otherwise involved in the employment decisions of any of the many municipalities, political subdivisions, and law enforcement agencies that seek access to LEADS information. As set out in more detail below, CPD inquired whether Respondent would allow its prospective employees – Charging Party and the others – access to confidential, law enforcement information through LEADS. LEADS applied its access criteria, and responded accordingly. LEADS was never Charging Party's prospective employer. As a result, the Commission should reject Charging Party's invitation to improperly exercise its jurisdiction over this Respondent on the facts of this Charge.

Even though the lack of an employment relationship is enough to result in a finding of no probable cause of discrimination, regardless, Charging Party was not singled out by, or treated differently because of, his race. On November 8, 2019, CPD's LEADS Terminal Agency Coordinator (TAC) Sheila Bond sent an email to LEADS with a list of potential CPD employees. TAC Bond forwarded candidates' names and records, and requested a review of each candidates' criminal record and a decision on granting LEADS access. LEADS Program Administrator Kara Joseph also ran a criminal history on each candidate. She requested additional information from TAC Bond relating to the records for Charging Party, since no disposition was included on his criminal history record.

On November 13, 2019, TAC Bond sent Ms. Joseph some of the requested documents – a portion of a 2005 police report, a portion of the Charging Party's application with CPD describing that 2005 incident, and a portion of Charging Party's polygraph examination. The polygraph asked Charging Party to "explain in detail any physical confrontations in which you were involved with a spouse, parent, or other family member, boyfriend, girlfriend, or other family member [sic.]." Charging Party described a 2005 incident, corresponding to the 2005 portion of a police report, which documented an injury to the victim/other participant in the altercation, his girlfriend at the time. The report went further, though, reciting her claim that Charging Party "jumped on her back and took her to the ground with a headlock," and "further stated that [Charging Party] began to choke her when he got her to the ground" then stating she "had a small amount of blood on her shirt. It appears to come from her bottom lip." Neither Charging Party's response in the polygraph nor the records from CPD addressed an earlier arrest that Ms. Joseph uncovered and inquired about. LEADS Administrator John Moore reviewed all documentation and denied access according to LEADS standards based on the police report, polygraph report, arrest in 2005, and earlier incident. LEADS emailed TAC Bond copies of the letters (denial and approval of LEADS access) for each candidate. In Charging Party's denial, LEADS stated the agency could appeal the decision. (Exhibit B.)

Charging Party's access to confidential state and federal law enforcement information had nothing to do with his race. Respondent is unsure which Caucasian the Charging Party is referring to when he states "LEADS gave access to a Caucasian convicted of a crime." Tellingly, though, one day after LEADS Administrator Moore sent CPD notice of Charging Party's denial of access, Mr. Moore sent another letter to CPD revoking access for a Caucasian Sergeant already at CPD who was arrested on the same charge as Charging Party. (Exhibit C.) Even though this clearly shows that at the very same time as Charging Party's denial, LEADS was administering access uniformly regardless of race, what is more is that it does not appear that LEADS Administrator Moore was even aware of Charging Party's race when Moore made the decision not to extend access. So, not only was Charging Party treated the same, it appears that his race simply was never a consideration.

Cincinnati Police Department had the right to appeal all denials to access LEADS. LEADS has no appeals on file from the Cincinnati Police Department to reinstate access for denied users.

## II.     Management is responsible for the above discriminatory actions.

Neither the Ohio State Highway Patrol that houses LEADS, nor the United States Department of Justice that controls NCIC, were part of the "management" of the Cincinnati Police Department. LEADS does not make any recommendation to Cincinnati Police Department on whether they should or should not hire a prospective employee. The decision to rescind his employment offer rested solely with the Cincinnati Police Department.

### III. I believe I have been discriminated against, in violation of Title VII of the Civil Rights Act of 1967, as amended.

Respondent was not Charging Party's actual or prospective employer, and did not discriminate against Charging Party based on his race. Charging Party omitted pertinent information from his employment application and background check. The Department's denial of LEADS access was based on a particularized review of his criminal record and consistent with other denials, including one for a Caucasian officer whose access LEADS shut off the day after it denied Charging Party's access for the same offense of domestic violence. Charging Party, or perhaps even the Commission, may not agree with LEADS, the Highway Patrol, Ohio Department of Public Safety, FBI, or Department of Justice about the strictness of the standards used to decide who will have access to vital and confidential criminal justice information. Such disagreement, though, does not show discrimination; and, that is especially so where, as here, decisions are based on a reasonable and particularized review of each applicant that is applied regardless of race.

Charging Party has presented no factual evidence to prove a violation of the Title VII of the Civil Rights Act of 1964 or Ohio Revised Code 4112. Respondent does not discriminate in any way contradictory with the laws of the United States or the State of Ohio on the basis of race, sex, color, religion, age, national origin, sexual orientation, gender identity or disability.

Should additional information or allegations arise during the course of EEOC's investigation, Respondent requests the opportunity to respond.

Based on the foregoing, Respondent respectfully requests a no probable cause finding with respect to Charging Party's charge of discrimination.

Respectfully Submitted,


Toby Chambliss
EEO Officer

Date: _____March 9, 2020_____



May 15, 2020

**EXHIBIT D**

James Webb, Investigator
U.S. Equal Employment Opportunity Commission
Cincinnati Area Office
John W. Peck Fed. Bldg.
550 Main Street, Room 10-019
Cincinnati, Ohio 45202

        Re: Jonathan Jones vs. Cincinnati Police Department; *Charge No. 473-2020-00274*

Dear Mr. Webb:

        The following is Respondent's position statement and relevant documents in response to Charging Party Jonathan Jones' (Jones) Charge of Discrimination. Jones alleges that he was the victim of race discrimination when his offer of employment as a police recruit was withdrawn. Jones' claims are without merit. Jones was denied access to the Law Enforcement Automated Data System (LEADS) by the Ohio State Patrol. Without access to this database, Jones was unable to perform the essential function of a police officer and his conditional offer of employment was withdrawn. The City of Cincinnati and Cincinnati Police Department (collectively "City") do not control access to this database and are unaware of any Caucasian recruit who received differential treatment.

        On January 16, 2020 Jones filed a Charge of Discrimination against the Cincinnati Police Department (CPD), alleging that she was the victim of race discrimination. Specifically, Jones alleges:

I.     I am African American. On November 21, 2019, I had an appeal hearing with Law Enforcement Administrative Data System (LEADS) and Cincinnati Police Department (CPD) did not represent me or give me the option to have representation. CPD represented a Caucasian recruit, who was appealing decision made by LEADS. CPD then rescinded my job offer and told me that they already had my replacement.

II.    Management is responsible for the above discriminatory actions.

{00314396-1}

    III.    I believe I have been discriminated against because of Race, in violation of Title VII of the Civil Rights Act of 1964, as amended.

**Response:**

LEADS is the statewide computerized network which provides computerized data and communications for criminal justice agencies within the state of Ohio. LEADS is administered by the Ohio State Highway Patrol Superintendent.[1] From a practical standpoint, LEADS is one of a police officers' key tools, allowing them to run social security numbers and license plates of individuals they encounter, access BMV records, and look to determine if suspects have open warrants. Without access to this critical information, police officers cannot perform the essential functions of their jobs.[2] Access to LEADS is approved and controlled by the Ohio State Highway Patrol.

In 2019, Jones received a conditional offer of employment for a police recruit with CPD. Prior to the start of the recruit class on December 2, 2019, information about all recruits who indicated that they had been arrested or convicted of a crime on their Personal History Questionnaire (PHQ) was sent to the Ohio State Highway Patrol for a determination as to whether the recruits would be granted LEADS access. Because Jones indicated that he had been arrested for Domestic Violence and plead guilty to a Disorderly Conduct charge, information about this arrest was sent to the LEADS Administrator.[3] On November 13, 2019, CPD received a letter from John M. Moore, LEADS Administrator stating:

> The criminal history record of Jonathan Jones has been reviewed at the request of CINCINNATI POLICE DEPARTMENT. Due to disqualifying prior criminal convictions and/or arrests, Jonathan Jones is denied access to LEADS.

As a result of this denial, Jones' conditional offer of employment was withdrawn.

On November 21, 2019, Jones appeared before the City of Cincinnati and Board of Education Civil Service Commission ("Commission") to appeal his removal from the police recruit process. The hearing on this date was *not* an appeal to the Ohio State Highway Patrol or the LEADS Administrator. After hearing from Jones' and representatives of CPD, the Commission denied Jones' request to be put back in the recruit class. It should be noted, that appeals and appearances for removal from eligibility lists or recruit classes are frequently heard by the Commission. Generally, the City does not represent or advocate for individuals in these appearances as the removals were made at the request of the City. Appeals and appearances are controlled by the Civil Service Commission Rules.[4]

---

[1] Ohio Administrative Code 4501:2-10(W)
[2] See attached job classification for a Police Officer.
[3] See attached documents.
[4] See attached documents.

{00314396-1}

It is unclear to whom Jones is referring when he states that CPD represented a Caucasian recruit who was appealing a decision made by LEADS. No other recruits were denied access to LEADS.

Jones's conditional offer of employment was withdrawn for the simple and non-discriminatory reason that the was denied access to the LEADS database by the Ohio State Highway Patrol. The City does not control this process or have any authority over LEADS access. Without access to LEADS Jones would be unable to perform the essential functions of his job as a police recruit. Based on the foregoing, it is requested that this charge be dismissed in its entirety. If you need any additional information or have any questions please contact me at (513)352-4703 or lauren.credittmai@cincinnati-oh.gov.

Sincerely,

*/s/Lauren Creditt Mai*

Lauren Creditt Mai

Senior Assistant Solicitor